UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Darlene Gowdy Reed,                                   Case No. 3:16-cv-02216

         Plaintiff

v.                                            MEMORANDUM OPINION
                                               AND ORDER

LMN Development, LLC,

         Defendant

## I.     INTRODUCTION

Before me is the motion for summary judgment filed by Defendant LMN Development, LLC. (Doc. No. 19). Plaintiff Darlene Gowdy Reed filed a memorandum in opposition, (Doc. No. 22), and Defendant replied. (Doc. No. 23).

## II.     BACKGROUND

The present litigation is related to *Reed v. LMN Development, LLC*, No. 3:14-cv-1695, 2016 WL 3523639 (N.D. Ohio June 28, 2016) (Katz, J.). There, Reed filed suit against LMN, Development, LLC, doing business as Kalahari Resorts and Conventions, alleging violations of the Family and Medical Leave Act (FMLA) as well as violations of various Ohio laws. Judge David A. Katz granted summary judgment in LMN's favor on Reed's claims brought under federal law and declined to exercise supplemental jurisdiction over Reed's claims under state law.

Reed then brought the state law claims in the Court of Common Pleas of Erie County, Ohio. LMN, which is incorporated in Wisconsin and has its principal place of business in Wisconsin as well, removed the action to federal court on the basis of diversity jurisdiction pursuant

to 28 U.S.C. § 1441(a)-(b). Reed is an Ohio resident and the amount in controversy exceeds $75,000. Thus, this court has original jurisdiction over the state law claims. *See* 28 U.S.C. § 1332(a).

In this action, Reed brings four state law claims: (1) workers' compensation retaliation in violation of O.R.C. § 4123.90; (2) disability discrimination in violation of O.R.C. § 4112; (3) failure to accommodate in violation of O.R.C. § 4112; and (4) intentional infliction of emotional distress.

Reed began working for LMN in April 2008, when she was hired to work at the Kalahari Resort in Sandusky, Ohio. (Doc. No. 1-1 at 4). Reed worked in the public area housekeeping department. (*Id.*). On July 13, 2012, Reed injured her back while moving furniture as part of her job. Reed filed a workers' compensation claim, which LMN did not contest, and she received benefits as a result of that claim. (*Id.*).

Following this back injury, Reed's treating physician identified certain work restrictions, which limited Reed's ability to perform some of the duties of her position. (Doc. No. 19-2 at 34, 58, 61-62, 71). To accommodate these restrictions, LMN offered Reed a light-duty position in the laundry department. (*Id.* at 11). There, Reed would sit at a table and cut old towels into rags. (*Id.* at 85-86). Reed was aware that this was not a permanent position at the resort and that it had been offered to her in lieu of not working at all. (Doc. No. 19-2 at 80; Doc. No. 19-1).

Reed was moved, at her request, from the laundry department to the retail department in January 2013. (Doc. No. 19-2 at 50-51). Two months later, in March 2013, Reed was transferred again, this time from retail to the spa area. At that time, Reed was still unable to perform the duties required of her former housekeeping position. (*Id.* at 62). Reed was transferred out of the spa at her request in May 2013, and she returned to work in her previous position in the laundry department. (*Id.* at 63).

In July 2013, LMN changed its policy regarding light-duty work. (Doc. No. 19-1 at 2-3). While the old policy placed no limitation on the amount of time an employee could hold a position performing light-duty work, the new policy limited the maximum amount of time to 120 days. (*Id.*)

LMN explained the policy change to Reed and presented her with a Bona Fide Offer of Employment, which Reed signed, and which stated: "Absent special circumstances or applicable law, the temporary, light-duty position will generally be available only for a maximum of 120 days." *Reed*, 2016 WL 3523639 at *2.

On August 5, 2013, Reed suffered additional injuries after stepping in a hole while working. (Doc. No. 22 at 2). Reed filed another workers' compensation claim. (*Id.*). In September, LMN brought in an occupational therapist to work with Reed in an effort to facilitate her return to her former housekeeping position. (Doc. No. 19 at 14). Reed refused to meet with the therapist after one or two sessions. (*Id.*).

On October 2, 2013, Reed suffered additional injuries, this time from a non-work-related car accident. (Doc. No. 22 at 2). As a result, Reed applied for FMLA leave, which LMN granted, and which Reed took from October 1, 2013 to October 29, 2013. (*Id.*). When this leave ran its course, Reed returned to work in the light-duty position in the laundry department for just over a month before requesting a personal leave of absence so that she could move to a new residence. (Doc. No. 19 at 15). LMN granted her request and Reed was given time off from November 28, 2013 to December 28, 2013, the maximum amount of time that LMN's policy permitted. (*Id.*).

On December 27, the day before Reed was set to return to work, she spoke with Kalahari's Director of Human Resources for the Sandusky location, Angela Reyes. (*Id.*). Reyes told Reed that Reed had used all of the 120 days of light-duty work available to her under LMN's policy and explained that Reed could return to work only if she could perform the duties of her former housekeeping position. (Doc. No. 19-2 at 111). Because Reed was still unable to perform those duties, she did not return to work when her personal leave of absence expired on December 29, 2013. (Doc. No. 19 at 16). LMN chose to treat her continued absence as FMLA leave, and informed Reed that she could return to her housekeeping position whenever her work restrictions were altered and she could perform the duties required of employees in that role. (*Id.*). Following

3

this, Reed began collecting unemployment insurance and looking for another job with a different employer. (Doc. No. 19-2 at 118, 153).

LMN terminated Reed's employment on February 6, 2014, after an incident led LMN to believe that Reed had violated company policy. Under the relevant policy, employees could purchase discounted water park day passes for $10. (Doc. No. 22-12). Employees can acquire these passes from Human Resources. LMN's policy provides, "[t]he discount is also available for up to five (5) friends and family members – provided the Associate is with guest(s) at all times." (*Id.*). Reed testified that Nick Hovde, a rooms division executive at Kalahari, routinely gave her permission to acquire more than five passes for family and friends. (Doc. No. 19-2 at 123). At the time, comparable passes were available to the public for approximately $60. (Doc. No. 19-2 at 119). The policy prohibits employees from reselling the passes for a profit. Resale of the passes for profit is considered theft and a basis for immediate termination.

Reed claims that LMN also offers employees the opportunity to purchase what she terms "hotel guest passes" from the front desk of resort hotels when the Human Resources department is closed. According to Reed, these passes are regularly available for purchase as long as the hotel is below a certain occupancy. (Doc. No. 19-2 at 122-23). These passes are similar to the water park day passes, although they last longer, expiring at 3:00 pm the day after they are used rather than at the end of the day they are used. (Doc. No. 19 at 16).

On January 14, 2014, Reed purchased 14 of these passes for friends and family, paying the discounted rate of $10 each, for a total of $140. (Doc. No. 19-2 at 125-26). Reed later gave those passes to another individual, Brandi Trautman, for $156. (Doc. No. 19 at 17). Reed claims this reflected the $140 she paid for the passes plus $16 in gas she used to get the passes. (Doc. No. 19-2 at 138-39).

On January 19, Ms. Trautman, her friend Kori Lather, and a group of children, visited the park using the passes, but because the passes were designated for use on the day before, they expired

4

at 3:00 pm. (Doc. No. 19 at 17). LMN told Trautman and her group that they had to leave the park, and Trautman proceeded to the front desk to complain about the expiration of the passes. (*Id.*). Kalahari's Guest Services Manager, Su Peterson, gave the group new day passes after Ms. Lather gave a written statement regarding the incident. (*Id.*).

Following this, LMN asked Reed to come in and speak with a member of security regarding the incident, but Reed refused. (Doc. No. 19-2 at 130-31, 144). Reed eventually returned to the resort on February 6, 2014, at which time LMN informed her she was being terminated for reselling the water park passes for a profit in violation of company policy.

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. DISCUSSION

#### A. Workers' Compensation Retaliation

Reed's first claim is for workers' compensation retaliation in violation of O.R.C. § 4123.90. In relevant part, § 4123.90 provides:

> No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer.

5

O.R.C. § 4123.90. Ohio courts analyze claims under § 4123.90 using the *McDonnell Douglas* burden-shifting framework that governs federal retaliation and discrimination claims. *Sharp v. Profitt*, 674 F. App'x 440, 444 (6th Cir. 2016).

Under that framework, the employee must first establish a *prima facie* case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). If the employee does so, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 252 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer does so, the burden shifts back to the employee to "specifically show that the employer's purported reason is pretextual and that the real reason the employer discharged the employee was because the employee engaged in activity that is protected under the Ohio Workers' Compensation Act." *Sharp*, 674 F. App'x at 444 (further citation and internal quotation marks omitted).

1. ***Prima Facie* case**

The parties cite variations of a three-prong test used by Ohio courts to determine whether plaintiffs have established a *prima facie* case of retaliation. (Doc. No. 19 at 20; Doc. No. 22 at 7-8).[1] But, since this litigation began, the Supreme Court of Ohio has clarified that plaintiffs do not have to show the first prong of these tests, that they were actually injured on the job, to recover under O.R.C. § 4123.90. See *Onderko v. Sierra Lobo, Inc.*, 69 N.E. 3d 679, 685 (Ohio 2016). In doing so, the court did not directly address the proper test going forward.

Because of this, I follow the Sixth Circuit's approach as it appeared in *Sharp*, under which Reed must show that: (1) she engaged in protected activity; (2) LMN took an adverse employment

---

[1] Under these tests, a plaintiff must show: (1) they were injured on the job; (2) they filed a claim for workers' compensation; and (3) some causal connection between their filing and the adverse action they suffered. *See, e.g.*, *Cunningham v. Steubenville Orthopedics & Sports Med., Inc.*, 888 N.E.2d 499, 508 (Ohio Ct. App. 2008).

6

action; and (3) a causal link existed between Reed's protected activity and the adverse action taken by LMN. *Sharp*, 674 F. App'x at 444. LMN concedes the first two elements are met but disputes the third.

"The causation element requires a plaintiff to show by a preponderance of the evidence that his discharge was retaliatory—that is, motivated by a workers' compensation filing." *Sharp*, 674 F. App'x at 445 (citing *Sutton v. Tomco Machining, Inc.*, 950 N.E.2d 938, 943 (Ohio 2011)). Relevant factors at this stage include "the length of time between the claim and the discharge, changes in salary level, hostile attitudes emerging, and *whether legitimate reasons exist for the discharge*." *Sharp*, 674 F. App'x at 445 (emphasis in original) (quotation omitted).

To establish causation, Reed relies primarily on temporal proximity. Specifically, "the timing connection between her disability leaves and Kalahari's investigations." (Doc. No. 22 at 11). Reed also claims that the investigations into her leave represent hostile attitudes emerging at LMN. Finally, Reed claims her managers' behavior after her disability issues started demonstrates LMN's hostility to her workers' compensation claim. (*Id.*).

Reed was fired in February 2014, after filing workers' compensation claims in July 2012 and August 2013. Because the protected activity is her filing a workers' compensation claim, the temporal proximity between that and the adverse employment action is, at best, six months. Ohio courts have found gaps much shorter than this are not sufficient to show a causal connection. *See Harris v. OHNH EMP, L.L.C.*, 37 N.E.3d 1256 (Ohio App. 9th Dist. 2015); *see also Hunt v. Monro Muffler Brake, Inc.*, 769 F. App'x 253, 258 (6th Cir. 2019) (holding six-and-a-half-month gap between injury and termination is not enough to create inference of causal connection).

While the temporal proximity between her disability leaves and LMN's investigations is much closer, this does not help Reed's case because LMN's investigations were not related to her pursuit of workers' compensation. The fact that LMN conducted surveillance of Reed while she

7

was on FMLA leave does not show that her employer was hostile to her pursuing workers' compensation for an unrelated injury.

Further, even if Reed could overcome the fact that the investigations were not related to the injury for which she sought workers' compensation benefits, Ohio law precludes her from using the investigations to illustrate the kind of hostile attitude that would support finding causation. An employer's reasonable suspicion about the legitimacy of a workers' compensation claim is not sufficient to create a genuine dispute over retaliatory motive. *See Sharp*, 674 F. App'x at 445-46. Reyes testimony illustrates why her suspicion was reasonable in this case. Reyes heard Reed advertising her personal cleaning business on her voicemail, which Reyes found odd considering the strict restrictions Reed's doctor had prescribed. (Doc. No. 22-7 at 45-46).

Reed's remaining arguments are similarly unpersuasive. For example, she claims her managers in the laundry department were "nasty" to her. (Doc. No. 22 at 11). But she testified that those same managers are nasty to everyone, precluding any inference that their hostility was motivated by her pursuit of workers' compensation. Similarly, Reed argues she suffered constant harassment from taking leave and working light duty, but she fails to provide any support for this contention. Instead, in the portion of the record she cites in support of this claim, Reed testifies only to some poor interactions she had with management while working light duty, each of which was addressed and resolved by HR upon her reporting the incident. (Doc. No. 19-2 at 52-59). While Reed claims that everything was a "fight" during those times, she does not provide any detail to illustrate how LMN management was hostile to her because of her workers' compensation claim.

Because there is no evidence from which a reasonable jury could find a causal connection exists between Reed's protected activity and the adverse action, Reed fails to establish a *prima facie* case of workers' compensation retaliation.

## 2. Nondiscriminatory Reason and Pretext Analysis

Even if Reed could establish a *prima facie* case of workers' compensation retaliation, her claim would fail because LMN has identified a legitimate, nondiscriminatory reason for her termination, and Reed has failed to present evidence from which a reasonably jury could find this reason was pretextual.

Here, LMN relies on its honest belief that Reed violated company policy by reselling water park passes for a profit. LMN considered this theft of company property and a sufficient justification for termination. (Doc. No. 19 at 24). Thus, LMN has provided a legitimate, nondiscriminatory reason for Reed's termination.

"Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

But as *Chen* further explained, these are not meant to operate as rigid categories, instead "[p]retext is a commonsense inquiry: did the employer fire the employer for the stated reason or not?" *Id.* at 400 n. 4. "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.* (citing *St. Mary's Honor Ctr.*, 509 U.S. at 515). "[A] reason cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515 (emphasis in original).

Reed denies reselling the passes for a profit, claiming instead that she received only compensation for the cost of the passes and the gas she used to retrieve them. Reed argues that LMN is using the story of her selling passes as pretext to retaliate against her for pursuing workers' compensation. LMN argues that even if Reed did not sell the passes for profit, it honestly believed she did.

9

Under the honest-belief rule, "an employer is entitled to 'summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless.'" *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591-92 (6th Cir. 2014) (quoting *Chen*, 580 F.3d at 401). "[A]n employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)) (original brackets omitted).

"In determining whether an employer 'reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)) (further citation omitted).

In light of the honest-belief rule, Reed's argument that she did not violate company policy is irrelevant. Instead, the question is whether LMN believed she did.

Reed argues LMN could not have honestly believed she violated company policy because LMN's policy does not prohibit an employee from being reimbursed for the discounted cost of the passes. In support, she first relies on the absence of any written policy governing the purchase of what she refers to as "hotel guest pass" wristbands. (Doc. No. 22 at 14). Reed also cites testimony of LMN officials, who indicated that receiving $140 for fourteen passes and $16 for gas would not, by itself, violate the company's policy. (Doc. No. 22-7 at 27 & Doc. No. 22-24 at 26).

But Reed's arguments seem to misunderstand what LMN's honest belief was at the time Reed was terminated. LMN did not fire Reed because it believed that receiving $140 as reimbursement for fourteen $10 passes and $16 as reimbursement for gas violated its policy. Instead, LMN fired Reed because it believed Reed sold the passes at a profit. (Doc. No. 19 at 27).

10

It formed this belief through reasonable reliance on particularized facts—chief among them, the undisputed fact that Reed received more money for the passes than she paid for them. LMN learned this by interviewing Ms. Lather. (Doc. No. 19-3 at 20-26). After learning that Reed had sold the passes for $156, LMN contacted Reed, asking her to come in and discuss the events of that weekend, but Reed refused. LMN came to a reasonable conclusion based on the information it had at the time.

Aside from the honest-belief rule, Reed also argues "there have been no [other] employees who have been terminated for the same facts as Reed." (Doc. No. 22 at 15). That may be so, but Reed cites no cases to support the claim that, to prevail at the pretext stage, an employer must prove they have fired someone for taking the exact same actions in the past. That no other employee has been fired for this exact conduct before is not probative unless there is evidence that other employees have engaged in this exact conduct. While LMN may not have fired past employees for receiving compensation for gas along with tickets given to friends and family, it is undisputed that LMN has terminated employees for stealing waterpark passes and reselling them at a profit. (Doc. No. 22 at 5).

Finally, Reed contends she was not punished for engaging in this conduct in the past, implying the real reason she was punished this time was her pursuit of workers' compensation. (Doc. No. 22 at 15-16). But the only evidence that Reed offers in support of this is Reyes' testimony that she believed Reed had resold passes in the past—testimony which Reed herself characterizes as an "unjustified, concocted and undocumented scenario" that illustrates the negative animus that LMN holds against her. Additionally, the relevant testimony says only that Reyes believed there was a prior incident where someone who did not belong at the park was there with wristbands they acquired from Reed. (Doc. No. 22-7 at 75-77). This is not enough for a reasonable jury to conclude that Reed violated the policy in the past and was not punished, much less that the reason she was punished this time had anything to do with her filing for workers' compensation.

11

Reed's claim for workers' compensation retaliation in violation of O.R.C. § 4123.90 fails because she cannot establish a *prima facie* case of retaliation. Additionally, even if Reed had established a *prima facie* case, LMN would prevail because it identified a legitimate, nondiscriminatory reason for Reed's termination, and Reed failed to present evidence from which a reasonable jury could conclude that reason was pretext for retaliation. Therefore, LMN is entitled to summary judgment on Reed's claim.

### B. Disability Discrimination

Reed's claim for disability discrimination in violation of O.R.C. § 4112.02(A) is also analyzed under the *McDonnell Douglas* burden-shifting framework. *Stanley v. BP Prods. N. Am., Inc.*, 753 F. App'x 378, 382 (6th Cir. 2018) (citing *Jaber v. FirstMerit Corp.*, 81 N.E.3d 879, 886 (Ohio Ct. App. 2017)) (further citation omitted).

1. **Prima Facie case**

To establish a *prima facie* case of Ohio disability discrimination, Reed must prove:

> (1) that he or she was disabled; (2) that the employer took an adverse employment action against the employee, at least in part[ ] because the employee was disabled; and (3) that the employee could safely and substantially perform the essential functions of the job in question despite his or her disability.

*Stanley*, 753 F. App'x at 382 (quoting *Steward v. Bear Mgmt., Inc.*, 98 N.E.3d 900, 904 (Ohio Ct. App. 2017)) (further citation omitted).

Reed argues her back injury constituted a disability, a point LMN does not contest. Instead, LMN argues that even if Reed is disabled, her claim must fail because she fails to establish the second and third prongs of the test for a *prima facie* case. I agree.

As to the second prong, Reed asserts LMN was aware of her injury and that Reyes questioned the severity of it. But neither Reyes' awareness nor her skepticism indicates that LMN fired Reed because of Reed's injury. Instead, the record shows LMN accommodated Reed's injuries for a year and a half prior to her termination. Reed also contends LMN made note of the fact that

she was on "disability" during their investigation into the incident with the passes, but this does not tend to show anything more than LMN's awareness of Reed's status. This in no way tends to show that the investigation occurred because of Reed's status, or that her status was in any way connected to her termination.

Even if there was some evidence to show Reed was fired because of her disability, Reed herself testified that at the time she was fired, she was unable to perform the duties of her former position. (Doc. No. 19-2 at 34, 112-13). Reed also testified that as of July 2015, she still could not perform those duties. (Doc. No. 22-2 at 50-51).

### 2. Nondiscriminatory Reason and Pretext Analysis

Finally, because Reed's claim for disability discrimination is also subject to the *McDonnell Douglas* framework, the earlier analysis regarding LMN's nondiscriminatory reason for her termination and her failure to demonstrate that reason was pretextual applies here as well. Thus, even if Reed could satisfy the *prima facie* burden for a claim of Ohio disability discrimination, LMN would be entitled to summary judgment because Reed has failed to show that LMN's proffered reason for her termination was pretext for discrimination. As such, LMN is granted summary judgment on this claim.

### C. Failure to Accommodate

Reed also claims that LMN violated O.R.C. § 4112.02 by failing to accommodate her disability by allowing her to work at a light-duty position. This claim is analyzed under the same framework as a failure to accommodate claim brought under the Americans with Disabilities Act ("ADA"). *See Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004).

Here, Reed's failure-to-accommodate claim is not subject to the *McDonnell Douglas* burden-shifting framework because she seeks to prove it by direct evidence. *See Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019) (further citation omitted) (explaining that because not

making reasonable accommodations is itself a form of disability discrimination, a failure to accommodate claim will necessarily involve direct evidence).

To establish her failure to accommodate claim, Reed must show: "(1) that she is disabled, and (2) that she is 'otherwise qualified for the position despite [ ] her disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation.'" *Morrissey*, 946 F.3d at 299 (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007)). If she succeeds in doing so, LMN has the burden of showing that any job requirement that Reed challenges is essential, or that Reed's proposed accommodation would impose an undue hardship. *Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 396 (6th Cir. 2019).

As was the case with Reed's earlier disability discrimination claim, LMN does not contest Reed's claimed disability. Instead, LMN argues that Reed failed to identify any reasonable accommodation that LMN could have made which would have allowed Reed to perform her job.

Generally, "[a] disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004) (quoting *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633-34 (6th Cir. 1998)). Reed fails to satisfy this requirement. While she alludes to the availability of light-duty work in the laundry room, (Doc. No. 22 at 12-13, 17), she ignores the fact that, as Judge Katz found previously, company policy precluded her from spending any more time in the light-duty position once her 120 days had run. *Reed*, 2016 WL 3523639 at *6.

Further, as LMN points out, the light-duty position in the laundry room is not a regular position, but a temporary one provided to recuperating employees. (Doc. No. 19 at 30). An employer is not required to create a new position for the plaintiff as an accommodation. *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 730 (6th Cir. 2000).

Reed also claims that she requested light-duty jobs handing out towels or wristbands. (Doc. No. 22 at 17). While it is true that "a 'reasonable accommodation' under the ADA may include 'reassignment to a *vacant* position,'" *Kleiber*, 485 F.3d at 869 (quoting 42 U.S.C.§ 12111(9)(B)) (emphasis in original), Reed has not offered any evidence from which a reasonable jury could conclude that such a vacancy existed at the relevant time period.

Because Reed has not identified any reasonable accommodations that LMN failed to make, LMN is entitled to summary judgment on Reed's failure to accommodate claim.

### D. Intentional Infliction of Emotional Distress

Reed's final claim is one for intentional infliction of emotional distress. Under Ohio law, a plaintiff bringing an intentional infliction of emotional distress (IIED) claim must show:

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Ondo v. City of Cleveland*, 795 F.3d 597, 611-12 (6th Cir. 2015) (citing *Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio Ct. App. 1995)) (further citation omitted).

Because Reed fails to satisfy the second element, I need not address the parties' arguments concerning the other three elements.

"Whether conduct is extreme and outrageous is initially a question of law for the court." *See v. Cleveland Clinic Found.*, 222 F. Supp. 3d 569, 576 (N.D. Ohio 2016) (quoting *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E.2d 696, 714 (Ohio Ct. App. 2009)). For conduct to rise to the level of extreme and outrageous, "[g]enerally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983) (quoting Restatement (Second) Torts § 46 cmt. D (1965)).

At the outset, "an employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) (citing *Baab v. AMR Servs. Corp.*, 811 F. Supp. 1246, 1269 (N.D. Ohio 1993)). Further, because I have already found that her termination was not based on discrimination, neither the fact that she was terminated nor the reason for her termination provides any support for her IIED claim.

Aside from the fact of her termination, Reed offers only one additional argument to show LMN's conduct was outrageous: Reed claims "[t]he only reason to subject [her] to 'constant and persistent scrutiny over several months was to intentionally harass her.'" (Doc. No. 22 at 18). This argument fails for two reasons.

First, it is incorrect to say that the LMN investigating Reed's capacity while she was out on leave constitutes harassment. As I explained in the context of Reed's workers' compensation retaliation claim, an employer's reasonable suspicion about the legitimacy of a workers' compensation claim is not probative evidence of any retaliatory or improper motive on the part of the employer. *See Sharp*, 674 F. App'x at 445-46.

Second, even if a jury found that LMN's investigations were simply an effort to harass Reed, that level of harassment would not rise to the level required for extreme and outrageous conduct. Reed claims that LMN conducted surveillance of her on five occasions, (Doc. No. 22 at 3), but fails to demonstrate how this surveillance, or any other form of increased scrutiny, represents the kind of extreme and outrageous behavior required for an IIED claim. While conducting surveillance of an employee in an effort to harass them because they took medical leave could certainly qualify as conduct that is unpleasant and unsettling, it still falls short of what is required by the high standard for extreme and outrageous conduct. *See Mendlovic v. Life Line Screening of Am., Ltd.*, 877 N.E.2d 377, 386 (Ohio Ct. App. 2007) (no extreme and outrageous conduct where employer: "barked" at

employee during company meeting; yelled at employee, blaming her for bad weather; told employee she was too busy at work to take vacation; and terminated employee); *Branan v. Mac Tools*, No. 03AP-1096, 2004 WL 2361568 (Ohio Ct. App. 2004) (no extreme and outrageous conduct where employer: interrogated employee for hours, refusing employee's requests to leave; physically intimidated employee; told employee they would never get another job in the industry and would not be able to feed their child; searched employee's personal belongings; and observed employee's home, taking pictures of home and vehicles parked in front of it); *Smith v. Lebanon City Schools*, No. CA99-02-024, 1999 WL 1016185 (Ohio Ct. App. 1999) (no extreme and outrageous conduct where employer: screamed and yelled at employee; berated employee in front of others; falsely accused employee of stealing money; called employee "moronic and uneducated"; and criticized employee for being a woman).

In sum, LMN is entitled to summary judgment on Reed's claim for intentional infliction of emotional distress because Reed fails to show that a reasonable jury could find LMN's conduct was extreme and outrageous.

## V. CONCLUSION

For the foregoing reasons, LMN's motion for summary judgment is granted.

So Ordered.

s/ Jeffrey J. Helmick  
United States District Judge